# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | |
| Plaintiff, | **Criminal No. 14-276 (ADM/SER)** |
| v. | |
| Leonard Dwayne Hill, | <u>**REPORT AND RECOMMENDATION**</u> |
| Defendant. | |

Benjamin Bejar and Craig R. Baune, Esqs., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff.

Robert D. Richman, Esq., P.O. Box 16643, St. Louis Park, Minnesota 55416, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case comes before the undersigned on Defendant Leonard Dwayne Hill's ("Hill") Motion to Suppress Statements, Admissions and Answers ("Motion to Suppress Statements") [Doc. No. 46] and Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Motion to Suppress Evidence") [Doc. No. 47]. This matter has been referred for the resolution of the issues raised in Hill's motion pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends denying Hill's motions.

## I.    BACKGROUND

On August 18, 2014, a grand jury indicted Hill on one count of felon in possession of ammunition (armed career criminal) in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). (Indictment) [Doc. No. 1 at 1–2]. On September 26, 2014, Hill pled guilty to the single count

charged in the Indictment. (Minute Entry Dated Sept. 26, 2014) [Doc. No. 19]. Hill subsequently filed a motion to withdraw his guilty plea and a motion for leave to file pretrial motions, both of which were granted by the Honorable Ann D. Montgomery. (Order Dated Mar. 20, 2015) [Doc. No. 40].

The Court held a hearing on Hill's pretrial motions on May 6, 2015. (Minute Entry Dated May 6, 2015) [Doc. No. 53]. At the hearing, the Court heard testimony from Officer Chris Rhoades ("Officer Rhoades"), Officer Michael Soucheray ("Officer Soucheray"), and Sergeant John Wuorinen. (Ex. & Witness List) [Doc. No. 54]. The Court received nine exhibits into evidence. (*Id.*).

At the request of the parties, the Court ordered supplemental briefing. *See* (Minute Entry Dated May 6, 2015). Hill submitted his supplemental brief on May 15, 2015, and Plaintiff United States of America (the "Government") submitted its response on May 29, 2015. (Mot. in Supp. of Mot. to Suppress Evidence, "Mem. in Supp.") [Doc. No. 58]; (Gov't's Mem. in Opp'n to Def.'s Mot. to Suppress Evidence, "Mem. in Opp'n") [Doc. No. 59]. This case is set for trial before Judge Montgomery on August 3, 2015. (Minute Entry Dated May 6, 2015).

II. FACTS

Around midnight on July 9, 2014, Officer Rhoades and Officer Soucheray responded to a 911 call of shots fired at Willard's Bar, around North Grotto Street ("Grotto") and Edmund Avenue West ("Edmund") in St. Paul, Minnesota. (Tr. of Mots. Hr'g, "Tr.") [Doc. No. 61 at 8–9, 12]. The officers arrived at the scene minutes after the 911 call and stopped their squad car one block north of the Grotto/Edmund intersection. (*Id.* at 10, 13–14); *see also* (Gov't's Ex. 1) (map of scene). Officer Soucheray entered Willard's Bar to see if he could view surveillance video that might reveal information related to the shots-fired call. *See* (Tr. at 13, 47). Officer Rhoades

walked south on Grotto. (*Id.* at 13). As he walked, Officer Rhoades observed several 9-millimeter shell casings on the sidewalk near Willard's Bar, "as well as farther south on Grotto." (*Id.* at 13–15).

Officer Rhoades spoke with witnesses gathered at the scene. (*Id.* at 13, 15). The witnesses stated that there had been two groups of people shooting at each other and that those involved in the shooting "had fled just prior to [law enforcement] arriving." (*Id.* at 15). One witness approached Officer Rhoades and asked him to "step off of the street" so that the witness could speak with him privately. (*Id.* at 16). This person informed Officer Rhoades that he had witnessed the "entire event" and that an individual Officer Rhoades had just spoken with—described by the witness as wearing a red shirt and shorts—had been with the shooter.[1] (*Id.* at 16–18). The witness told Officer Rhoades that the shooter was a heavyset black male also wearing a red shirt. (*Id.* at 31). Further, the witness informed Officer Rhoades that the shooter had approached a van parked nearby, opened the doors of the van, and said that "he was going to get more ammunition, and then closed the door." (*Id.* at 44–45). The shooter left, heading east on Edmund. (*Id.* at 18). Meanwhile, Officer Soucheray had reviewed surveillance video from Willard's Bar, and was providing his fellow officers with updates via radio "as he watched" the video. (*Id*. at 42); *see also* (*id*. at 58). The surveillance video, which was in black and white, showed the area outside of the bar and showed someone shooting a firearm. (*Id.* at 47–50, 59). Officer Soucheray aired that two groups of people were involved in the shooting, and that the shooter was a black male, wearing a light-colored t-shirt, long shorts, and sneakers, but no hat.

---

[1] The man identified as accompanying the shooter was described by Officer Rhoades as a "black male in a red shirt, smaller, with a hat." (Tr. at 18). The man told Officer Rhoades that he did not know anything about the shooting. (*Id.* at 18, 30). He was released and proceeded north on Grotto. (*Id.* at 18). Once the witness informed Officer Rhoades that the individual he had previously spoken with had been with the shooter, Officer Rhoades shared this information with other officers via radio, and the suspect was located and questioned by those officers. (*Id.* at 43).

3

(*Id.* at 51, 59). Officer Soucheray also aired the shooter's "approximate height and that he was probably a heavy build." (*Id.* at 51).

Having gathered information from witnesses and Officer Soucheray, Officer Rhoades walked to the van identified by the witness. (*Id.* at 16–18, 42). He looked in the van's windows to see if there were any weapons inside the vehicle or "anything . . . that would help . . . determine the owner" of the vehicle. (*Id.* at 20). While inspecting the van, Officer Rhoades noticed a male, later identified as Hill, walking northbound on Grotto and turning east on Edmund. (*Id.* at 21). Officer Rhoades noticed that Hill matched the description of the shooter the witness provided as well as the description Officer Soucheray aired. (*Id.* at 21, 22, 24). Hill was walking slowly and, based on his gait, Officer Rhoades believed that he was intoxicated. (*Id.* at 22, 32). As Hill walked by, Officer Rhoades asked him how he was doing. (*Id.* at 24). Hill responded, but his speech was slurred, and Officer Rhoades was unable to understand him. (*Id.*). Officer Rhoades asked Hill where he was coming from, and Hill told Officer Rhoades that he was coming from a Wendy's restaurant. (*Id.* at 24–25). This answer raised Officer Rhoades's suspicions because he knew that the nearest Wendy's restaurant was a half-mile from the scene of the shooting, and Hill "wasn't carrying any sort of food bag." (*Id.* at 25). Officer Rhoades then asked Hill why he would walk if the nearby van was his, and Hill responded, stating that the van was in fact his vehicle. (*Id.*).

At that point, Officer Rhoades suspected Hill was the shooter and placed him in handcuffs. (*Id.* at 25, 32). As he placed Hill in handcuffs, Officer Rhoades noticed that the left front "pocket of [Hill's] shorts was bulged." (*Id.* at 26, 33). Officer Rhoades conducted a pat-down for his safety, using "an open hand over [Hill's] outer clothing." (*Id.* at 25, 33). He began his pat-down of Hill with the left front pocket, but patted-down all of Hill's pockets. (*Id.* at 35).

4

Because Hill was wearing a t-shirt and did not have any pockets on his shirt, Officer Rhoades was "mainly concerned with . . . [Hill's] waistband and shorts." (*Id.*).

When he conducted a pat-down of Hill's left front pocket, Officer Rhoades "could immediately tell it was full of loose rounds of ammunition." (*Id.* at 26). Officer Rhoades could discern the size of the items in Hill's pocket, could roughly determine their shape, and could tell that the items were "hard and smooth." (*Id.* at 39–40). Officer Rhoades testified that he knew immediately that Hill's pocket contained loose rounds of ammunition based on his experience at the shooting range. (*Id.* at 26). Specifically, Officer Rhoades stated that officers are

> required to shoot roughly every other month at the range. You have to carry several boxes of ammo[,] but because of the size of the boxes you can't just put [the box] in your pockets. So it's standard practice for officers to simply empty the box into [their] pockets and that way you can reload from your pockets without having to go back to the office to get your ammunition.

(*Id.*). Officer Rhoades further explained that it is "not uncommon to touch [one's] own pocket[]," and that based on his experience at the shooting range, he was "pretty familiar with what a pocket full of ammo feels like." (*Id.* at 26, 34).

After the pat-down, Officer Rhoades radioed that he "had taken a possible suspect into custody." (*Id.* at 26). Officer Rhoades "reached in to empty [Hill's] pockets," but realized there were "too many items to control" between Hill and the "handful of ammunition." (*Id*. at 38). Officer Rhoades therefore walked with Hill over to a nearby squad car, where Officer Rhoades "emptied [Hill's] pockets onto the trunk so the items wouldn't roll away." (*Id.* at 26, 38–39). Officer Rhoades removed twenty-three rounds of ammunition and a twenty-dollar bill from Hill's left front pocket and a "set of car keys with [a] [key] fob" from Hill's right front pocket.

(*Id.* at 27–28).[2] The rounds of ammunition removed from Hill's pocket were "9-millimeter rounds consistent with the casings . . . found on the street." (*Id.* at 28–29). Officer Soucheray ultimately arrived at Officer Rhoades's location and "confirmed that the male" with Officer Rhoades "was the one he had seen on the surveillance footage" from Willard's Bar, and "Hill [was] formally placed under arrest at that point." (*Id.* at 29, 56–57).

### III. DISCUSSION

#### A. Motion to Suppress Statements

In his Motion to Suppress Statements, Hill asks the Court for "an order suppressing all statements, admissions and answers made by the defendant to law enforcement officers on July 10, 2014." (Mot. to Suppress Statements at 1). Hill did not, however, identify any issues or make any argument in support of his Motion to Suppress Statements in his supplemental briefing. *See generally* (Mem. in Supp.).[3] The parties were instructed on the record at the motion hearing that the Court would only address the issues identified and supported by the parties in their supplemental briefing. (Minute Entry Dated May 6, 2015 at 2); *see also* (Tr. at 70–71). Because Hill has failed to identify or support any issues regarding the suppression of statements, the Court does not further address the Motion to Suppress Statements and recommends that the motion be denied without prejudice.

---

[2] The Court references the twenty-dollar bill, car keys, and key fob taken from Hill's pockets in summarizing the facts, but does not discuss the seizure of these items elsewhere in this Report and Recommendation because Hill does not argue for suppression of these items. Rather he asks the Court to consider only whether the ammunition should be suppressed. (Mem. in Supp. at 2) ("The ammunition seized from . . . Hill without a warrant should now be suppressed."); (*Id.* at 5) ("The ammunition should be suppressed.").

[3] Indeed, Hill's Memorandum in Support is titled as briefing offered only in support of his Motion to Suppress Evidence, rather than in support of both motions to suppress. *See* (Mem. in Supp. at 1).

### B.   Motion to Suppress Evidence

#### 1.   Legal Standard

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Consistent with the Fourth Amendment, "[l]aw enforcement officers may make an investigatory stop if they have a reasonable and articulable suspicion of criminal activity." *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1, 25–31 (1968)). "A reasonable suspicion is a particularized and objective basis for suspecting the person who is stopped." *Id.* (internal quotation marks omitted).

During an investigative *Terry* stop "officers should use the least intrusive means of detention and investigation reasonably necessary to achieve the purpose of the detention." *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006). Officers are "authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo." *Id.* If, in the course of an investigative stop, "'an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a pat-down search 'to determine whether the person is in fact carrying a weapon.'" *Bustos-Torres*, 396 F.3d at 943 (quoting *Terry*, 392 U.S. at 24).

A pat-down or "protective frisk" for officer safety is warranted when "specific articulable facts taken together with rational inferences support the reasonable suspicion that a party was potentially armed and dangerous." *United States v. Binion*, 570 F.3d 1034, 1039 (8th Cir. 2009) (internal quotation marks omitted). Whether a frisk was supported by reasonable suspicion is an objective inquiry and requires the court to consider "'whether a reasonably prudent man in the

circumstances would be warranted in the belief that his safety or that of others was in danger.'"

*Id.* (quoting *Terry*, 392 U.S. at 27).

> While the "purpose of a pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence," and while the search must therefore "be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby," officers may lawfully seize contraband they incidentally discover in "plain touch" during a *Terry* frisk.

*Bustos-Torres*, 396 F.3d at 943–44 (citation omitted).

Under the plain-touch doctrine, when an officer "'lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent,'" the officer may seize the item without a warrant. *Id.* at 944 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375–76 (1993)). "[T]he plain-touch doctrine extends to the lawful discovery of any incriminating evidence, not just contraband such as drugs." *Id.* In order to lawfully seize an item based on plain touch, the officer performing a *Terry* frisk must have "probable cause to believe the item in plain touch is incriminating evidence." *Id.* "To give rise to probable cause, the incriminating character of the object must be immediately identifiable." *Id.* at 945.

### 2. Analysis

The issues before the Court are whether Officer Rhoades had reasonable suspicion to conduct a pat-down of Hill and whether Officer Rhoades improperly expanded the scope of the pat-down. *See* (Mem. in Supp. at 2–5); (Mem. in Opp'n at 5–11). For the reasons stated below, the Court concludes that Officer Rhoades had, at a minimum, reasonable suspicion to conduct a pat-down of Hill and that Officer Rhoades did not improperly expand the scope of the pat-down, as the seizure of the ammunition in Hill's pocket was lawful under the plain-feel doctrine.

a.   *Terry* **Frisk**[4]

Based on the facts available to law enforcement at the time of Officer Rhoades's frisk of Hill, "taken together with the rational inferences" therefrom, there was reasonable suspicion that Hill was "potentially armed and dangerous." *See Binion*, 570 F.3d at 1039 (internal quotation marks omitted). At the time of the frisk, Officer Rhoades was canvassing the street in the middle of the night in response to a report that shots had been fired just minutes earlier. (Tr. at 8, 10, 13). The report was that shots had been fired near Willard's Bar. (*Id.* at 12). At the scene, Officer Rhoades observed several shell casings on the street. (*Id.* at 13, 15). An eyewitness had informed him that the shooter was a heavyset black male wearing a red shirt, and that the shooter said he was going to get more ammunition, stopped at a nearby van, and then ultimately headed east on Edmund. (*Id.* at 18, 31, 44–45).

Consistent with the witness's description of the shooter, Officer Soucheray radioed to his fellow officers that based on his review of surveillance video, the shooter was a black male with a heavy build wearing a light-colored t-shirt. (*Id.* at 51, 59). Officer Soucheray also aired that the shooter was wearing long shorts and sneakers, but no hat. (*Id.* at 51, 59). Officer Rhoades encountered Hill walking east on Edmund Avenue near a van—the van that was identified by the witness as the place the shooter went when he was going to get more ammunition. *See* (*id.* at 21, 44–45). Hill told Officer Rhoades that the van was his. (*Id.* at 25, 45). Hill matched the witness's and Officer Soucheray's description of the shooter. (*Id.* at 21, 22, 24, 31, 51, 59). Hill appeared intoxicated and, when asked where he was coming from, gave an answer that aroused Officer Rhoades's suspicions, given the distance between Hill's present location and his alleged previous

---

[4]   Hill does not contend that Officer Rhoades lacked reasonable suspicion to conduct a *Terry* stop; instead he focuses only on the protective frisk and the subsequent seizure of ammunition from his pocket. *See generally* (Mem. in Supp.).

9

whereabouts. *See* (*id.* at 22, 25, 32). Officer Rhoades also noticed that the left front "pocket of [Hill's] shorts was bulged." (*Id.* at 26, 33). Under these circumstances Officer Rhoades was "'justified in believing that the individual whose suspicious behavior he [was] investigating at close range [was] armed and presently dangerous to the officer or to others,'" and was therefore justified conducting a *Terry* frisk.[5] *See Bustos-Torres*, 396 F.3d at 943 (quoting *Terry*, 392 U.S. at 24).

Hill's arguments that the circumstances here do not demonstrate reasonable suspicion that he was potentially armed and dangerous are without merit. Hill first argues that Officer Rhoades lacked reasonable suspicion because Officer Rhoades knew there were "at least two individuals matching [the witness's] description" of the shooter, "because he had already spoken to another man in a red t-shirt," and because Officer Soucheray's statement that "the shooter was wearing a light-colored t-shirt," conflicted with the witness's statement that the shooter was wearing a red t-shirt. (Mem in Supp. at 2–3). While it is true that Officer Rhoades had encountered another black male in a red shirt at the scene, the other individual did not actually match the witness's, or Officer Soucheray's, description of the shooter. The witness and Officer Soucheray described the shooter as heavyset or as having "a heavy build," while the other black male in a red shirt that Officer Rhoades encountered was described by Officer Rhoades as "smaller." *Compare* (Tr. at 18), *with* (*id.* at 31, 51). And Officer Soucheray radioed that the

---

[5] Hill does not specifically argue that Officer Rhoades's use of handcuffs was unlawful, but does state "there was no basis to **handcuff** . . . Hill and frisk him." (Mem. in Supp. at 3) (emphasis added). To the extent Hill specifically challenges Officer Rhoades's use of handcuffs, the Court finds the challenge to be without merit. *Cf. Martinez*, 462 F.3d at 907 (concluding that placing defendant in handcuffs "was a reasonable response to the situation in order to protect the officers' personal safety and to maintain the status quo" when officers knew the robbery they were investigating involved a gun, the defendant "was a close match to the description" of the perpetrator, was found "near the scene of the crime, acting suspiciously," and was found with a "wad of cash on [his] person").

shooter was not wearing a hat, while Officer Rhoades noted that the other male was wearing a hat. *Compare* (*id.* at 18) with (*id.* at 51). Indeed, the witness specifically told Officer Rhoades that the other male had been **with** the shooter, not that he **was** the shooter.[6] (*Id.* at 18). In addition, Hill's contention that Officer Soucheray's statement that the shooter was wearing a light-colored t-shirt and the witness's statement the shooter was wearing a red shirt creates a conflict is unconvincing: a description of the shirt as light-colored is simply not inconsistent with a description of the shirt as red.

Hill next argues that Officer Rhoades lacked reasonable suspicion to conduct a pat-down because the witness that described the shooter was "of unknown reliability." (Mem. in Supp. at 2). Hill cites no legal authority in support of his argument regarding the witness's reliability, *see* (*id.*), and the Court concludes that, applying the proper legal standards, the witness's tip contains sufficient indicia of reliability.

The witness approached Officer Rhoades, provided an eyewitness account of the events that had just occurred, including a description of the shooter, and informed Officer Rhoades of the direction in which the shooter fled. *See* (Tr. at 16, 18, 31). The witness's basis of knowledge, as well as the timing and detail of his statement to Officer Rhoades all support the witness's reliability. *Navarette v. California*, 134 S. Ct. 1683, 1689 (2014) (stating that "eyewitness knowledge . . . lends significant support to [a] tip's reliability" and that "contemporaneous report[s] [have] long been treated as especially reliable"); *United States v. Buchanan*, 574 F.3d

---

[6] Even if Officer Rhoades had encountered two men at the scene that matched the description of the shooter, this fact alone would not necessarily detract from or preclude a finding of reasonable suspicion as to one or both of the two men. That is, officers must consider the totality of the circumstances and, to warrant a *Terry* frisk, an officer need not be **certain** that the individual is armed and dangerous. *See Binion*, 570 F.3d at 1039 (noting that a "protective frisk" for officer safety is warranted when "specific articulable facts taken together with rational inferences support the reasonable suspicion that a party was potentially armed and dangerous" (internal quotation marks omitted)).

554, 561 (8th Cir. 2009) (noting the "indicia of reliability in the richness and detail of a first hand observation" (internal quotation marks omitted))). Officer Rhoades spoke with the witness in-person, a circumstance that also enhances the reliability and credibility of the witness, as in-person questioning provides law enforcement with an opportunity to "assess the credibility of [an] . . . informant[]." *Buchanan*, 574 F.3d at 562; *United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir. 2008); *see also United States v. Valentine*, 232 F.3d 350, 353–57 (3rd Cir. 2000) (concluding officers had reasonable suspicion in part because officers "received [a] face-to-face tip" and the "informant [gave] the police information about . . . someone nearby," thereby "expos[ing] [himself] to a risk of retaliation"). In addition, Officer Soucheray's description of the shooter based on the surveillance video corroborated the witness's description of the shooter. *See United States v. Manes*, 603 F.3d 451, 456 (8th Cir. 2010) (stating that an "informant's tip may support a reasonable suspicion if it has sufficient indicia of reliability, such as . . . independent corroboration of the tip"); *see* (Tr. at 21–22, 24–25, 31, 51, 59). Hill's argument that Officer Rhoades lacked reasonable suspicion because the witness was of unknown reliability is therefore without merit.[7]

In sum, "'a reasonably prudent'" officer faced with the circumstances faced by Officer Rhoades "'would be warranted in the belief that his safety or that of others was in danger.'" *See Binion*, 570 F.3d at 1039 (quoting *Terry*, 392 U.S. at 27). Because Officer Rhoades had reasonable suspicion that Hill was potentially armed and dangerous, the protective frisk of Hill was lawful.

---

[7]   In an apparent effort to support the witness's reliability, the Government states that the witness that spoke with Officer Rhoades was a "named citizen" (Mem. in Opp'n at 7). The Government did not however, elicit testimony on this point at the motion hearing. *See generally* (Tr.). Nonetheless, the Court finds the witness reliable for the reasons discussed above.

### b.   Scope of *Terry* Frisk and Plain-Feel Doctrine

Hill contends that [i]n all likelihood Officer Rhoades manipulated . . . Hill's pocket in order to get a sense of the size and shape of the objects in" the pocket and that Officer Rhoades therefore impermissibly expanded the scope of the *Terry* frisk. (Mem. in Supp. at 5). In other words, Hill contends that Officer Rhoades's seizure of the ammunition from his pocket was not permitted under the plain-feel doctrine because Officer Rhoades could not tell immediately, based on plain touch, that what he felt during his pat-down search of Hill was ammunition. *See* (*id.* at 3–5).

Officer Rhoades testified that he "could immediately tell" Hill's pocket "was full of loose rounds of ammunition." (Tr. at 26). Given the circumstances present at the time of the *Terry* frisk as thoroughly described above, and after observing Officer Rhoades's demeanor on the witness stand, the Court finds Officer Rhoades's testimony that he immediately identified the objects in Hill's pocket as loose rounds of ammunition to be credible.

Hill argues that Officer Rhoades's testimony is "incredible and should be rejected." (Mem. in Supp. at 4). In an effort to demonstrate Officer Rhoades's lack of credibility, Hill asserts that Officer Rhoades "came prepared with a backstory" about being familiar with the feel of ammunition in a pocket based on his experience of using his own pockets to store ammunition during target practice. (*Id.*). While Hill characterizes Officer Rhoades's testimony about his familiarity with the feel of ammunition in a pocket based on his experiences at the shooting range as a "backstory," the Court finds Officer Rhoades's testimony in this regard credible. Officer Rhoades explained that target practice is required regularly and that it is "standard practice" for officers to empty ammunition into their pockets. (Tr. at 26). It is both logical and believable that Officer Rhoades's experiences during target practice familiarized him with the

feel of an ammunition-filled pocket, which supports his testimony that he could immediately identify the loose rounds of ammunition in Hill's pocket as such, without manipulation.

Hill further argues that Officer Rhoades's testimony is unbelievable in light of his police report. (Mem. in Supp. at 5). In the report, Officer Rhoades stated that during the pat-down he "'could feel what felt like a large amount of ammunition in [Hill's] front left pocket'" and that he "'then put [his] hand into the pocket and confirmed the item [he] felt was in fact a handful of 9[-millimeter] ammunition.'" (*Id.*). Hill appears to rely on Officer Rhoades's use of the word "confirm" in his report to demonstrate that the contents of Hill's pocket was not immediately apparent to Officer Rhoades during the pat-down. (*Id.*).

The Court concludes that Officer Rhoades's statements in his report do not undermine his testimony that it was immediately apparent to him, based on an open-handed pat-down, that the objects in Hill's pocket were loose rounds of ammunition, nor do these statements demonstrate that Officer Rhoades otherwise impermissibly expanded the scope of the *Terry* frisk. That is, Officer Rhoades's statement that he "put [his] hand into [Hill's] pocket and confirmed" that what he felt during the pat-down was ammunition is not inconsistent with his testimony that the objects in Hill's pocket were immediately identifiable as ammunition: It was immediately apparent to Officer Rhoades that Hill's pocket contained numerous loose rounds of ammunition, giving him, in light of the circumstances, "probable cause to believe the item in plain touch [was] incriminating evidence," and thus the ability to seize the items without a warrant. *See Bustos-Torres*, 396 F.3d at 944–45 (concluding that cash in defendant's pocket was "immediately identifiable to the . . . touch as incriminating evidence," considering the large amount of cash discovered in the pocket and the "circumstances which justified the *Terry* stop in the first place"); *see also United States v. Jackson*, 179 Fed. App'x 921, 931 (6th Cir. 2006) (rejecting

defendant's argument that pat-down was "not confined to a search for weapons," and that seizure of ammunition was therefore unlawful, reasoning in part that "[t]he seizure was . . . reasonable under *Dickerson*, as [the officer] testified that he instantly recognized the feel of ammunition"). Officer Rhoades then put his hand into Hill's pocket "'and confirmed . . . in fact'" what was already immediately apparent to him.[8] *See* (Mem. in Supp. at 5) (quoting Officer Rhoades's report). Under the circumstances, Officer Rhoades lawfully seized the ammunition without a warrant. *See Bustos-Torres*, 396 F.3d at 944–45.

### c.   Conclusion

For the reasons discussed above, the Court concludes that Officer Rhoades had reasonable suspicion that Hill was potentially armed and dangerous, justifying a *Terry* frisk of Hill's person. The Court further concludes that Officer Rhoades did not unlawfully expand the scope of the *Terry* frisk and that Officer Rhoades's warrantless seizure of the ammunition in Hill's pocket was lawful under the plain-feel doctrine.[9]

---

[8]   As noted, Officer Rhoades explained the he did not fully remove the ammunition when he first reached into Hill's pocket because as he started to empty Hill's pockets, (i.e., seize the ammunition), he realized there were "too many items to control." (Tr. at 38). He therefore moved Hill to a different location before fully removing the ammunition from Hill's pocket. (*Id.* at 38–39). The Court finds that this logistical issue is of no constitutional consequence, as Officer Rhoades already had probable cause to believe the items in plain touch constituted incriminating evidence when he reached into Hill's pocket.

[9]   The parties have primarily addressed the Fourth Amendment issues here under the *Terry* and plain-feel frameworks, and, as discussed above, the Court concludes that Officer Rhoades conducted a lawful *Terry* frisk of Hill and that he lawfully seized the ammunition in Hill's pocket under the plain-feel doctrine. The Government argues that the seizure of ammunition from Hill's pocket was also justified as a search incident to arrest. (Mem. in Opp'n at 11–13). Searches incident to arrest provide an exception to the warrant requirement. *See United States v. Rousseau*, No. 13-CR-0014 (PJS/FLN), 2013 WL 1788082, at *2 (D. Minn. Apr. 26, 2013). An officer "'who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area within his immediate control.'" *Id.* (quoting *Davis v. United States*, 131 S. Ct. 2419, 2424 (2011)). Considering the facts described above, the Court concludes that the search of Hill and seizure of the ammunition was also lawful under the search incident to arrest exception.

### III. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Leonard Dwayne Hill's ("Hill") Motion to Suppress Statements, Admissions and Answers [Doc. No. 46] be **DENIED without prejudice**; and

2. Hill's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 47] be **DENIED.**

Dated: June 26, 2015

>*s/Steven E. Rau*
>STEVEN E. RAU
>United States Magistrate Judge

### Notice

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.